**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| THE YOUNG MEN'S CHRISTIAN | ) | Case No. 20-20786 |
| ASSOCIATION OF TOPEKA, KANSAS, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**COREFIRST BANK & TRUST'S SUPPLEMENT TO OBJECTION TO
DEBTOR'S MOTION UNDER RULE 3017(e) OF FEDERAL RULES OF
BANKRUPTCY PROCEDURE TO DETERMINE ADEQUACY OF
PROCEDURES FOR PLAN VOTING**

**COMES NOW**, CoreFirst Bank & Trust ("CoreFirst"), by and through its attorneys, Riordan, Fincher & Beckerman, P.A., and hereby supplements it objection to the motion filed by the Debtor to Determine Adequacy of Procedures for Plan Voting under Rule 3017(e) of the Federal Rules of Bankruptcy Procedure.

As discussed at the October 9, 2020 hearing, the dispositive issue under consideration is whether the bond holders under any of the bond documents granted CoreFirst, as the indenture trustee of the bonds, the right to vote on plan treatment. CoreFirst asserts that no bond document grants that authority. The Debtor contends that CoreFirst has this authority under two theories: 1.) that there is no privity of contract between the Debtor and the bond holders; and 2.) that the bond documents grant CoreFirst the authority to vote on plan treatment.

**I.     The issue of contractual privity is irrelevant under the nature of the bonds at issue.**

The bonds in this case are economic development revenue bonds issued under the authority of K.S.A. §12-1740 to 12-1749d. Under these statutes, a city issues the bonds, the proceeds from the bond sales are used to build and equip a physical facility for a third party, the city and the third party enter into a lease, and the third party's rental payments under the lease pay the bond holders.

1

Under this statutory transaction, there are two significant factors relevant to the debtor's motion. The first is the bonds issued by the City of Topeka which involve the City and the bond holders. The second is the lease between the City of Topeka and the debtor. That the two factors concern different parties (i.e., the City and the bond holders, and the City and the Debtor) is the basis of the Debtor's privity argument. However, the relevant portions of K.S.A. §12-1740 to 12-1749d, and the applicable case law interpreting the same do not support the Debtor's argument. Instead, both the statutes and the case law show that the bond holders are <u>direct creditors</u> of this Debtor.

The relevant statutory language for this transaction is as follows (emphasis added):

### <u>K.S.A. §12-1740. Purpose of act; revenue bonds.</u>

It is the purpose of this act to promote, stimulate and develop the general welfare and economic prosperity of the state of Kansas through the promotion and advancement of physical and mental health, industrial, commercial, agricultural, natural resources and of recreational development in the state; to encourage and assist in the location of new business and industry in this state and the expansion, relocation or retention of existing business, industry and health development; and to promote the economic stability of the state by providing greater employment opportunities, diversification of industry and improved physical and mental health, thus promoting the general welfare of the citizens of this state ***by authorizing all cities and counties of the state to issue revenue bonds, the proceeds of which shall be used for the purpose of paying all or part of the cost of purchasing, acquiring, constructing, reconstructing, improving, equipping, furnishing, repairing, enlarging or remodeling facilities for agricultural, commercial, hospital, industrial, natural resources, recreational development and manufacturing purposes and to enter into leases or lease-purchase agreements with any person, firm or corporation for such facilities.*** For the purpose of this act, the term facility shall include a site and the necessary site preparation, structures, easements, rights-of-way and appurtenances necessary and convenient to the particular type of facility being financed.

### <u>K.S.A. §12-1741. Issuance of revenue bonds by cities; lease-purchase agreements.</u>

Subject to the provisions of K.S.A. 12-1744a and 12-1744b, and amendments thereto, ***any city shall have power to issue revenue bonds, the proceeds of which shall be used for the purpose of paying all or part of the cost of purchasing, acquiring, constructing, reconstructing, improving, equipping, furnishing, repairing, enlarging or remodeling facilities for agricultural, commercial,***

2

*hospital, industrial, natural resources, recreational development and manufacturing purposes. Any city shall also have power to enter into leases or lease-purchase agreements by ordinance with any person, firm or corporation for the facilities*. Except as otherwise provided in K.S.A. 12-1741a, and amendments thereto, the facilities may be constructed within the city or its environs without limitation as to distance, providing the governing body of the city declares that the facility, if in being, would promote the welfare of the city.

### K.S.A. §12-1741b. Issuance of revenue bonds by counties; lease-purchase agreements; location of facilities; letter of intent, resolution of intent or inducement resolution, approval required, when.

(a) Subject to the provisions of K.S.A. 12-1744a and 12-1744b, and amendments thereto, *any county shall have power to issue revenue bonds, the proceeds of which shall be used for the purpose of paying all or part of the cost of purchasing, acquiring, constructing, reconstructing, improving, equipping, furnishing, repairing, enlarging or remodeling of facilities for agricultural, commercial, hospital, industrial, natural resources, recreational development and manufacturing purposes. Any county shall also have the power to enter into leases or lease-purchase agreements by resolution with any person, firm or corporation for the facilities.* Except as otherwise provided in subsection (b) of this section, the facilities may be constructed within the county or its environs without limitation as to distance, providing the board of county commissioners declares that the facility, if in being, would promote the welfare of the county.

### K.S.A. §12-1742. Conditions of leases and lease-purchase agreements; origination fee; apportionment of payments in lieu of taxes; administrative costs.

*Such agreements shall provide for a rental sufficient to repay the principal of and the interest on the revenue bonds.* Such agreements also may provide that the lessee shall reimburse the city or county for its actual costs of administering and supervising the issue. The city or county may charge an origination fee. Such fee shall not be deemed a payment in lieu of taxes hereunder. Such fee shall be used exclusively for local economic development activities but shall not be used to pay any administrative costs of the city or county. Except for the origination fee, all other fees paid in excess of such actual costs and any other obligation assumed under the contract shall be deemed payments in lieu of taxes and distributed as provided herein. If the agreement provides for a payment in lieu of taxes to the city or county, such payment, immediately upon receipt of same, shall be transmitted by the city or county to the county treasurer of the county in which the city is located. Payments in lieu of taxes received pursuant to agreements entered into after the effective date of this act shall include all fees or charges paid for services normally and customarily paid from the proceeds of general property tax levies, except for extraordinary services provided for the facility or an extraordinary level of services required by a facility. Payments in lieu of taxes may be required only

3

upon property for which an exemption from ad valorem property taxes has been granted by the state board of tax appeals. The county treasurer shall apportion such payment among the taxing subdivisions of this state in the territory in which the facility is located. Any payment in lieu of taxes shall be divided by the county treasurer among such taxing subdivisions in the same proportion that the amount of the total mill levy of each individual taxing subdivision bears to the aggregate of such levies of all the taxing subdivisions among which the division is to be made. For purposes of this section, the total mill levy shall not include the mill levy imposed pursuant to K.S.A. 72-53,113, and amendments thereto. The county treasurer shall pay such amounts to the taxing subdivisions at the same time or times as their regular operating tax rate mill levy is paid to them. Based upon the assessed valuation which such facility would have if it were upon the tax rolls of the county, the county clerk shall compute the total of the property taxes which would be levied upon such facility by all taxing subdivisions within which the facility is located if such property were taxable.

### K.S.A. §12-1743.  Same; obligations payable solely from rentals; bonds, requirements.

*Nothing in this act shall be so construed as to authorize or permit any city or county to make any contract or to incur any obligation of any kind or nature except such as shall be evidenced by the issuance of revenue bonds payable solely out of the rentals received from such facilities.*

Revenue bonds issued under the provisions of this act are declared to be negotiable instruments, shall be executed by the mayor and clerk of the city or the chairperson of the board of county commissioners and the clerk of the county and the corporate seal of the city or county shall be affixed to or imprinted thereon. *The principal of and interest on the revenue bonds shall be payable solely and only from the special fund herein authorized for such payments, and the revenue bonds shall not in any respect be a general obligation of such city or county, nor shall they be payable in any manner by taxation.* All details pertaining to the issuance of the revenue bonds and the terms and conditions thereof shall be determined by ordinance of the city or resolution of the county.

### K.S.A. §12-1744.  Same; pledge of facility and earnings.

*The governing body of the city by ordinance or the board of county commissioners by resolution may pledge the facility and the net earnings therefrom to the payment of the revenue bonds and the interest thereon,* and may provide that the net earnings thereof shall be set apart as a sinking fund for that purpose.

4

**K.S.A. §12-1747.  Same; revenue bonds defined; recitals.**

Revenue bonds, as the term is used in this act, *are defined to be bonds issued by any such city or county to be paid exclusively from the revenue produced by the facilities purchased, acquired, constructed, reconstructed, improved, equipped, furnished, repaired, enlarged or remodeled by the proceeds of such revenue bonds.* The revenue bonds shall not be general obligations of the city or county, and shall not contain the recitals set forth in K.S.A. 10-112, or any amendments thereto. The revenue bonds shall, however, contain the following recitals, viz.: Such bonds shall recite the authority under which such revenue bonds are issued, and that they are issued in conformity with the provisions, restrictions and limitations thereof, and *that such bonds and the interest thereon are to be paid from the money and revenue received from the fees charged and rental received for the use of the property and facilities purchased, acquired, constructed, reconstructed, improved, equipped, furnished, repaired, enlarged or remodeled by the proceeds, in whole or in part, of such revenue bonds when issued and sold.*

The Kansas Supreme Court has interpreted the statutory nature of the bonds and any lease as a single transaction that lies outside the scope of the Uniform Commercial Code.

A city or county can neither contract nor incur any obligation for the payment of the revenue bonds. The bonds cannot be general obligation bonds of the city or county, nor payable by taxation. The revenue bonds must be paid from the rentals received from the facilities. K.S.A. 12–1743. A city by ordinance or a county by resolution may pledge the facility and the net earnings from the facility to pay the bondholders. K.S.A. 12–1744. The lease or lease-purchase agreement of the facility may provide that payment of or security for the revenue bonds may include the land, the buildings, the furnishings and the equipment used by the facility. K.S.A. 12–1747.

…

Under the Act, a lease-purchase agreement of a facility which includes realty, furnishings and equipment is to be viewed as a single transaction and as one created by the legislature. Obviously, there were policy reasons the legislature intended that the transaction be characterized as a lease-purchase agreement and not subject to Article 9 of the UCC. To do otherwise would certainly discourage bondholders who would be dependent upon the city or the county to protect their interest by filing a financing statement.

*Petition of City of Moran*, 238 Kan. 513, 520-21, 713 P.2d 513, 456-57 (1986).

The most comprehensive analysis of the nature of the bonds was conducted under a series of bankruptcy decisions in 1994.  The decisions are found at:

*In re Kar Development Associates,* LP, 180 B.R. 597 (Bankr. D. Kan. 1994)

5

*In re Kar Development Associates*, LP, 180 B.R. 624 (Bankr. D. Kan. 1994)

*In re Kar Development Associates*, LP, 180 B.R. 629 (Bankr. D. Kan. 1994)

Under these decisions, bonds in a bankruptcy constitute secured loans. The Court in the *KAR Development* cases determined that the bond holders were simply creditors of the lessee debtor.

The *KAR Development* cases highlight the difference in treatment of contract language that may exist between a bankruptcy and non-bankruptcy case. The *KAR Development* cases were decided under the economic realities test, a test for which the explicit language of contract documents is not dispositive. Under the analysis of the *KAR Development* cases, the bond holders have a claim against the Debtor even though the lease and the bonds are between different parties. Therefore, the issue of contractual privity in this case is irrelevant.

To hold otherwise would mean that the underlying lease is a true lease, subject to 11 U.S.C. §365, which would create a significant new set of problems and issues for the debtor, and would be contrary to the Debtor's characterization of the debt in all other aspects of the case. For example, on pages 7 to 9 of the Debtor's plan, the Debtor adopts the *KAR Development* cases. Page 25 of the Debtor's plan states that "The secured creditors consist of the claim of the Series 2011A bond holders represented by CoreFirst Bank as Bond Trustee." The Debtor cannot claim that the debt it owes is a secured loan, using the *KAR Development* cases and the economic realities analysis under those cases, but then ignore that analysis on the basis that there is no contractual privity between the Debtor and the bond holders.

## II.     The Trustee Indenture does not allocate plan treatment decisions to the Indenture Trustee.

The three relevant authorities for this issue are 11 U.S.C. §1126 and Fed. R. Bankr. P. 3018. 11 U.S.C. §1126(a) states:

(a)    The holder of a claim or interest allowed under section 502 of this title may accept or reject a plan. If the United States is a creditor or equity security holder, the Secretary of the Treasury may accept or reject the plan on behalf of the United States.

Bankruptcy Rule 3018(c) states:

(c) FORM OF ACCEPTANCE OR REJECTION. An acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an ***authorized agent***, and conform to the appropriate Official Form. If more than one plan is transmitted pursuant to Rule 3017, an acceptance or rejection may be filed by each creditor or equity security holder for any number of plans transmitted and if acceptances are filed for more than one plan, the creditor or equity security holder may indicate a preference or preferences among the plans so accepted.

(emphasis added).  Local Bankruptcy Rule 3018(a).1 states:

(a) ENTITIES ENTITLED TO ACCEPT OR REJECT PLAN; TIME FOR ACCEPTANCE OR REJECTION. A plan may be accepted or rejected in accordance with § 1126 of the Code within the time fixed by the court pursuant to Rule 3017, 3017.1, or 3017.2. Subject to subdivision (b) of this rule, an equity security holder or creditor whose claim is based on a security of record shall not be entitled to accept or reject a plan unless the equity security holder or creditor is the holder of record of the security on the date the order approving the disclosure statement is entered or on another date fixed by the court under Rule 3017.2, or fixed for cause, after notice and a hearing. For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection. Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan.

The case law interpreting these authorities holds that the individual bond holders are the parties that vote on plan treatment.  *See, eg., In re Pioneer Finance Corp.,* 246 B.R. 626 (Bankr. D. Nev. 2000); *In re City of Colorado Springs Spring Creek Gen. Improvement Dist*., 177 B.R. 684 (Bankr. D. Colo. 1995); *In re Southland Corp.,* 124 B.R. 211 (Bankr. N.D. Tex. 1991). These cases also explain the role of the different parties in a bond transaction (i.e., the indenture trustee, the record holders and the individual bond holders).  These cases follow long-standing authorities

that predate the Bankruptcy Code regarding individual bond holders' right to vote. *See, e.g., In re Allied Owners' Corp.*, 74 F.2d 201 (2nd Cir. 1934).

A bond holder can always delegate its right to vote to the Indenture Trustee under Bankruptcy Rule 3018(a). The issue before the Court is whether such a delegation has been exercised. The answer is no, it has not.

The debtor has submitted multiple bond documents to the Court. However, none of these documents contain sufficient authorization to allow CoreFirst to vote on plan treatment. The most relevant provision is on page 46 of the Indenture:

> Upon the occurrence of an Event of Default the Trustee shall be and is hereby authorized to bring appropriate action for judgment or such other relief as may be appropriate and such action may be in the name of the Trustee or in the name of the Issuer and Trustee jointly; but in such case, the Issuer shall have no obligation for any fees and expenses of such action except out of any funds which might come into the hands of the Issuer by reason of the ownership of the Project and this Trust Indenture and the Lease. *In addition, the Trustee may file such proof of claim and such other documents as may be necessary and advisable in order to have the claims of the Trustee and the Owners of the Bonds relative to the Bonds or the obligations relating thereto allowed in any judicial proceeding.*

(emphasis added). While this provision allows CoreFirst to enforce and prosecute the claims on the bonds, it does not delegate to CoreFirst the right of the bond holders to vote on a plan.

The debtor has cited non-bond cases that address the delegation of authority under non-bond documents. However, these cases are inapplicable for the very reason that they are non-bond cases. None address the ability of an indenture trustee to vote on plan treatment on behalf of a bond holder.

The debtor argues the factual similarities of the cases to bonds. However, these cases do not involve bonds, and given the specific manner in which bonds have been addressed in bankruptcy, the cases are not applicable. The delegation of authority under those cases may have been sufficient as to non-bond agreements, but the delegation is not sufficient for bond agreements.

8

Consequently, the individual bond holders must be the one who vote on plan treatment. The debtor bears the responsibilities of completing the balloting, and therefore, must be the party that conducts the balloting. The manner of doing the balloting will be to engage a balloting agent. CoreFirst is attaching to this supplement objection, pleadings from a bankruptcy case in the Western District of Texas that it believes is the appropriate procedure to follow. These pleadings are attached as Exhibit "A" and incorporated herein.

To the extent that the Court denies the debtor's motion and rules that ballots must go to the individual bond holders, an additional issue will arise. The debtor's plan treats the bond claim as undersecured, and bifurcates the claim into secured and unsecured claims. To that extent, the potential application of 11 U.S.C. §1111(b) arises, and any balloting process needs to allow voting by the bond holders pursuant 11 U.S.C. §1111(b). *See In rem Tem-Fla Partners*, 1993 WL 151346 (Bankr. W.D. Tenn. April 29, 1993). In the present case, as a Subchapter V with no disclosure statement, there is no deadline for any 1111(b) election and the matter can be addressed as part of confirmation.

**WHEREFORE,** CoreFirst Bank & Trust respectfully requests the Court grant relief in accordance with the objection above; and requests the Court grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

**s/R. Patrick Riordan**
R. Patrick Riordan, #15518
RIORDAN, FINCHER
& BECKERMAN, P.A.
3735 SW Wanamaker Road, Suite A
Topeka, KS 66610
(785) 783-8323; (785) 783-8327 (fax)
riordan@rfb-lawfirm.com
Attorney for CoreFirst Bank & Trust

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of October 2020, I electronically filed the above and foregoing using the CM/ECF system which sent notification to all parties of interest participating in the CM/ECF system.

**s/R. Patrick Riordan**
R. Patrick Riordan, #15518