# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: | ) |
| | ) |
| THE YOUNG MEN'S CHRISTIAN | )  Case No.  20-20786 |
| ASSOCIATION OF TOPEKA, KANSAS | )  Chapter 11 |
| | ) |
| Debtor-in-Possession | ) |

## DEBTOR'S SECOND AMENDED SUBCHAPTER V – SMALL BUSINESS DEBTOR REORGANIZATON PLAN
## DATED JULY 1, 2021

The debtor, The Young Men's Christian Association of Topeka, Kansas ("Debtor" or "Topeka Y"), a 501(c)(3) corporation, proposes this Plan of Reorganization ("Plan") pursuant to Subchapter V – Small Business Debtor Reorganization Act, Pub. L. 116-54 (as amended).  The general provisions of this provision of the United States Bankruptcy Code ("Bankruptcy Code") are contained in 11 U.S.C. §1181, *et seq.*

## ARTICLE 1
## PROPONENT

The proponent, the Debtor, proposes its plan of adjustment of its debt pursuant to Subchapter V – Small Business Debtor Reorganization of Title 11 of the United States Bankruptcy Code.  All terms shall have the same definitions used in the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Kansas.

## ARTICLE 2
## SUBMISSION OF INCOME

Except as specifically provided herein, the Debtor shall pay to its creditors such portion of its earnings and other future income as is necessary for the execution of this Plan for a 3-year period of time as is required under 11 U.S.C. §1191(c)(2)(A).  In no event, however, shall the portion of the Debtor's earnings and other future income paid pursuant to this Plan be less than the projected disposable income of the Debtor for the 3-year period of time. The payments to creditors will be made as hereinafter provided herein and in the attached exhibits.

## ARTICLE 3
## VALUE OF PROPERTY TO BE DISTRIBUTED

The value of property to be distributed in the 3-year period under this Plan beginning on the date in which the first distribution is due under the Plan is not less than the projected disposable income of the Debtor pursuant to 11 U.S.C. §1191(c)(2)(B), nor less than the value of the unencumbered assets free of liens.

1

**ARTICLE 4**
**FEASIBILITY**

The Debtor asserts that it will be able to make all payments under the Plan. The Debtor's projections are attached as Exhibit B.

**ARTICLE 5**
**PAYMENTS TO CREDITORS**

To the extent this is a consensual Plan approved by the Debtor's creditors, the Debtor shall make such payments directly to the creditors and the Trustee shall be discharged or terminated from all required duties.

In the event that this Plan is confirmed on an nonconsensual basis, payments shall be made to the Trustee to be distributed in accordance with this Plan under 11 U.S.C. §1194. It is not anticipated that there will be payments to the Trustee prior to confirmation of this Plan.

At the conclusion of the 3-year Plan period, the Trustee's services shall terminate, the Debtor discharged under 11 U.S.C. §1192 and the case closed.

**ARTICLE 6**
**PROPERTY OF THE ESTATE**

To the extent that the Debtor's Plan is confirmed under 11 U.S.C. § 1191(b), upon confirmation of the Debtor's Plan, property of the estate shall include, in addition to the property specified in 11 U.S.C. §541:

      a.     All property that the Debtor acquires after the commencement of the case, but before the case is closed, dismissed or converted; and

      b.     Earnings from services performed by the Debtor after the commencement of the case, but before the case is closed, dismissed or converted.

**ARTICLE 7**
**VESTING OF ASSETS**

Upon confirmation of this Plan, the Debtor shall remain in possession of all property of the estate. However, the property will vest in the Debtor free and clear of all liens and encumbrances, except as set forth herein for those creditor(s) who hold non-avoidable secured liens upon the Debtor's property and whose amortization of debt period exceeds the 3-year Plan period.

**ARTICLE 8**
**EXEMPTION FROM TRANSFER TAXES**

Under, and to the fullest extent permitted by 11 U.S.C. §1146(a) of the Bankruptcy Code, the making or delivery of any instrument whatsoever in furtherance of or in connection with the Plan will not be subject to any document recording tax, stamp tax, conveyance fee, mortgage tax,

2

real estate transfer tax, mortgage recording tax, filing or recording fee, or other similar tax or governmental assessments.

## ARTICLE 9
## PRIORITY CREDITORS

Creditors holding claims entitled to priority under 11 U.S.C. §507 shall be paid in full in cash payments as set out in **Exhibit A(1)** attached hereto on the Effective Date or within 180 days after confirmation if they agree to such 180-day treatment.

## ARTICLE 10
## CLASSIFICATION AND TREATMENT OF SECURED CREDITORS

The only creditor in this class is the secured portion of the Series 2011A bondholders represented by CoreFirst Bank as Bond Trustee (**Exhibit A(2)**). The secured claim is CoreFirst's valuation of the Debtor's real estate ($2,010,000.00). The remaining amount of the allowed claim of CoreFirst Bank as Bond Trustee will be treated as an unsecured claim as set forth in Article 11.

CoreFirst Bank filed a claim on behalf of all bondholders in this case in the amount of $5,774,391.48 as of August 6, 2020. The claim of CoreFirst Bank presumably is the collective claim of all bondholders.

## ARTICLE 11
## CLASSIFICATION AND TREATMENT OF UNSECURED CREDITORS AND ELECTION FOR CLASS B CREDITORS TO BE TREATED UNDER CLASS A

Creditors holding unsecured claims (including the unsecured claims of under-secured creditors), except those entitled to priority under 11 U.S.C. §507, shall be classified and treated under two classes of participation, a class for creditors with allowed claims that are in the amount of $2,500.00 or less (Article 11 – Class A), and all other unsecured creditors whose allowed claims exceed $2,500.00 (Article 11 – Class B). Any unsecured creditor in Article 11 – Class B, may, by marking the appropriate election on the Ballot, elect to be treated as a creditor under Article 11, Class A and receive a maximum payment of $2,500.00 in full satisfaction of its Allowed Claim.

## ARTICLE 12
## OBJECTIONS TO CLAIMS

From and after the Effective Date (which is defined as thirty (30) days after the entry of the order confirming the Plan), both the Debtor and Trustee will have authority to file, settle, compromise, withdraw or litigate to judgment objections to claims. The Trustee will have standing to file objections to such claims even if such claims were scheduled by the Debtor as undisputed, liquidated and non-contingent. The Trustee will file objections to such claims no later than ninety (90) days after the Effective Date (unless extended by an order of the Bankruptcy Court); provided, however, that the Trustee may file objections to such claims within ninety (90) days of the filing of an amended claim.

3

If the Trustee objected to a claim, payment will be withheld only with respect to the amount actually in dispute, and such objection will not affect payments or distributions under the Plan on the undisputed portion of the claim.

The Debtor and Trustee further reserve the right to object to any claim as part of the Plan balloting and confirmation process required under 11 U.S.C. §1191, 11 U.S.C. §1125 and 11 U.S.C. §1126.

## ARTICLE 13
## INJUNCTION

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ON AND AFTER THE CONFIRMATION DATE, EXCEPT AS OTHERWISE SET FORTH IN THE PLAN, ALL PERSONS AND ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD LIENS, CLAIMS OR INTERESTS IN OR AGAINST THE DEBTOR ARE, WITH RESPECT TO OR ON ACCOUNT OF ANY SUCH LIENS, CLAIM OR INTERESTS, ENJOINED FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING THE DEBTOR OR ITS PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (II) ENFORCING AGAINST, LEVING UPON OR ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT) THE DEBTOR OR ITS PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS, OR PROFESSIONALS; (III) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PREJUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS WHETHER DIRECTLY OR INDIRECTLY, OF ANY JUDGMENT, AWARD, DECREE, CLAIM OR ORDER AGAINST THE DEBTOR OR ITS PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS OR PROFESSIONALS; (IV) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY LIENS, CLAIMS OR INTERESTS OF ANY KIND AGAINST OR IN THE DEBTOR OR ANY OF ITS PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS OR PROFESSIONALS; (V) OTHER THAN AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN, ASSERTING ANY RIGHT OF SETOFF, SUBORDINATION OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE THE DEBTOR OR ANY OF ITS PROPERTY, DIRECT OR INDIRECT TRANSFEREES, DIRECT OR INDIRECT SUCCESSORS IN INTEREST, REPRESENTATIVES, AGENTS OR PROFESSIONALS; AND (VI) TAKING ANY ACTIONS IN ANY PLACE AND IN ANY MANNER WHATSOEVER THAT DO NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN WITHOUT LEAVE OF THE BANKRUPTCY COURT.

Except as otherwise provided in the Plan and Confirmation Order, all injunctions or stays provided for in the case under 11 U.S.C. §105 or 11 U.S.C. §362 of the Bankruptcy Code, or

otherwise, and in existence on the confirmation date, will remain in full force and effect through the imposition of the injunction set forth above.

## ARTICLE 14
## EXCULPATION AND LIMITATION OF LIABILITY

Neither the Debtor, nor any of its respective members, officers, directors, shareholders, employees, advisors, attorneys or agents or representatives acting in such capacity, will have or incur any liability to, or be subject to any right of action by, any person or entity, for any act or omission in connection with, relating to or arising out of, the case or the pursuit of confirmation of the Plan, except to the extent arising out of fraud, willful misconduct or gross negligence, and in all respects will be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## ARTICLE 15
## EXECUTORY CONTRACTS

All executory contracts of the Debtor that: (i) are not identified as being assumed; (ii) have not expired by their own terms; or (iii) have not otherwise been assumed prior to confirmation of the Plan will be deemed rejected under 11 U.S.C. §365 of the Bankruptcy Code on the Effective Date.

To the extent that the Court may rule that business agreements between the Debtor and the Series 2011A bondholders are in the nature of an executory contract, as opposed to a disguised financing transaction, the Debtor reserves the right to assume or reject such contracts within sixty (60) days of the final order of a court of competent jurisdiction construing, ordering or finding that such documents are in the nature of a true lease under 11 U.S.C. §365.

All proofs of claim with respect to claims arising from the rejection of executory contract must be filed with the Bankruptcy Court no later than thirty (30) days after the Confirmation Date. The claims of any person arising from the rejection of executory contracts or unexpired leases that fails to timely file a proof of claim will be discharged under 11 U.S.C. §1141(d) of the Bankruptcy Code and forever barred from assertion against the Debtor or its assets.

## ARTICLE 16
## CURE OF DEFAULTS

No cure of defaults is provided for under this Plan, except by the payment of Plan payments.

## ARTICLE 17
## APPLICATION OF PAYMENTS

Payments through this Plan, whether made by the Debtor under a consensual confirmed Plan or by the Trustee under a nonconsensual confirmed Plan, shall be allocated as follows:

a. To the payment of administrative expenses that may be due, including

5

professional expenses and the Trustee's approved hourly compensation;

       b.      Pro rata to the payment of claims entitled to priority under 11 U.S.C. §507 and as may be specified in Exhibit A(1);

       c.      To the secured claim of the bondholders under the Economic Development Refunding Revenue Bonds, Series 2011A ("Series 2011A Bonds");

       d.      To the de minimis unsecured class of creditors whose individual claims are $2,500.00 or less (Article 11 – Class A) and those in Article 11 – Class B that elect to be treated under Class A; and

       e.      Pro rata to the payment of all other unsecured and the under-secured claims of the bondholders under the Series 2011A Bonds (Article 11 – Class B).

All payments under the Series 2011A Bonds will be paid to the Indenture Bond Trustee for distribution by the Bond Trustee pursuant to its duties under the Trust Indenture.

## ARTICLE 18
## EFFECTIVE DATE

       The Plan shall become effective thirty (30) days after the entry of the Order of Confirmation by the United States Bankruptcy Court.

## ARTICLE 19
## EFFECT OF CONFIRMATION

       The Court shall retain jurisdiction of the assets of the estate pending the Debtor's discharge. The Debtor may seek modification of the Plan after confirmation pursuant to 11 U.S.C. §1193 upon such notice as the Court shall direct. Confirmation shall bind the Debtor, each creditor and each bondholder as provided in 11 U.S.C. §1191. Except as provided by separate Court Order, confirmation of the Plan shall continue to act as a stay of any action against the Debtor or property of the estate of the Debtor.

## ARTICLE 20
## MODIFICATION OF THE PLAN

       As provided in 11 U.S.C. §1193, the Plan and related documents may be altered, amended or modified by the Debtor before or after the confirmation date.

## ARTICLE 21
## DISCHARGE

       Upon completion of all payments provided for under the Plan, the Debtor shall be discharged by the Court except as provided in 11 U.S.C. §1192.

## ARTICLE 22

6

**22.1** **History**

The Topeka Y was formed in 1880 and has been serving Topeka since its formation.  An early director of the Topeka Y was James Naismith, the inventor of basketball.

The Topeka Y had three locations, a north side and downtown location, as well as the Southwest Topeka Facility that is currently owned by the Debtor.  The north side and downtown locations have been sold, as well as a camp location maintained by the Topeka Y, thus the only remaining location is the location at 37th Street and Chelsea Drive in Topeka, Kansas (the "Southwest Topeka Facility").

The Topeka Y currently offers quality care for preschool and school age children, a gym facility, after school activities, full day kid's club, quality youth and summer camps.

In 2000, the City of Topeka issued Economic Development Refunding Revenue Bonds, Series 2000A, dated August 1, 2000 for the funding of construction of the Southwest Topeka Facility.  The Series 2000A bonds were issued to finance the construction, furnishing and equipping of the 38,000 square foot recreational health center.

In 2011, the Series 2011A Bonds were issued for the purpose of refunding and redeeming the City of Topeka's outstanding Series 2000A Bonds.  The Series 2011A Bonds issued on or about September 7, 2011 were in the original principal amount of $7,055,000.00.

The Series 2011A Bonds have not been registered with the U.S. Securities & Exchange Commission under the Securities Act of 1933, as amended, nor has the bond indenture been qualified under the Trust Indenture Act of 1939, as amended, in reliance upon exemptions contained in such Acts.  The Series 2011A Bonds were issued in accordance with K.S.A. 12-1740, *et seq*.

The Series 2011A Bonds are funded by a "lease" payment made by the Topeka Y to the City of Topeka under an alleged lease agreement dated September 1, 2011.  Kansas case law has substantiated that although the relationship between the City of Topeka as a fee title holder and the Topeka Y is a lessor/lessee relationship, the United States Bankruptcy Court for the District of Kansas has construed the transaction as a "disguised financing transaction," and thus able to be restructured under the provisions of the Bankruptcy Code.  Thus, the lease between the City of Topeka and the Topeka Y for the Southwest Topeka Facility is not a true lease that can be assumed or rejected under 11 U.S.C. §365, but a financing transaction that may be adjusted, restructured or "crammed down" to the value of the collateral.

Kansas Bankruptcy Courts hold that an Industrial Revenue Bond lease is a disguised financing transaction.  *See In Re KAR Development Associates, LP*, 180 B.R. 597 (Bankr. Kan. 1994) *aff'd City of Olathe v. KAR Development Associates, LP* (*In Re KAR Development Associates, LP*), 180 B.R. 629 (D. Kan. 1995); *contra In Re Petroleum Products, Inc.,* 72 B.R. 739 (Bankr. Kan. 1987), *aff'd* 180 B.R. 629 (D. Ct. Kan. 1995).  In other unpublished decisions, the Court has found that it is a disguised financing transaction.  *See In Re Southwind Hospice, LLC,*

Case No. 12-23053 (unpublished).

In *KAR*, the Kansas District Court utilized an economic realities test to determine that the following factors are relevant in deciding whether an agreement constitutes a true lease:

> "(1)     whether the amount of rent was calculated to compensate for use of the land or rather was based on some other purpose such as ensuring particular return on an investment;
>
> (2)     whether the property was purchased by the lessor specifically for the lessee's use;
>
> (3)      whether the transaction was called a lease in order to gain certain tax advantages;
>
> (4)     whether the lessee assumes many of the obligations normally reserved for the lessor; and
>
> (5)     whether the agreement permits or requires the lessee to purchase the property for a nominal sum at the end of the lease term."  180 B.R. at 639.

In *KAR*, the Court determined that the lease payments on the Industrial Revenue Bond were not related to rental value, but rather were calculated to retire the bond debt in a manner similar to repayment of a loan, much as the bond payments are under the Series 2011A Bond issuance.

Other factors noted in *KAR* were that the site for the facility was actually chosen by the debtor and that the transaction was termed a "lease" in order to meet the requirements of the Kansas Industrial Revenue Bond statute and thus to give tax advantages.  The debtor/lessee in *KAR* was responsible for ad valorem taxes and all repairs and maintenance, required to provide casualty and liability insurance and permitted to alter the facility and make additional improvements without the City's consent, as long as it did not affect the intended use or structural integrity.  Additionally, the bond issuance granted the debtor in *KAR* an option to purchase the property at the end of the term and prohibit the City from selling the property before then.

The Bankruptcy Court and District Court on appeal thus concluded that the agreements did not constitute a lease under the economic realities test.  180 B.R. at 639.  These factors exist in the Series 2011A Bond documents.

The Bond Purchase Agreement dated August 23, 2011 for the Series 2011A Bonds contains the following requirements of the Topeka Y pertaining to the bond issuance:

> a.      To pay all taxes upon the Southwest Topeka Facility;
>
> b.      To pay all insurance associated with the Southwest Topeka Facility;
>
> c.      To provide that any insurance proceeds are utilized to restore the property in the event of fire, casualty or damage;

        d.      Any claim concerning condemnation proceeds or the realization on a title insurance claim will be paid to the bondholders;

        e.      The Topeka Y is prohibited for future encumbrances, except as limited by the bond documents, or as authorized by the Bond Trustee;

        f.      A prohibition against sale, lease or other disposition of the property;

        g.      A prohibition against the merger, consolidation, sale or conveyance of the Topeka Y;

        h.      Certain financial ratio covenants to be maintained; and

        i.      An option to purchase.

*See* Bond Purchase Agreement, Pgs. C-33 through C-50.

## 22.2   Recent Financial History

Historical revenue of the Topeka Y, as gleaned from the Topeka Y's IRS Form 990 tax return, shows the following annual revenue:

      2016   $4,371,044.00;

      2017   $4,451,571.00;

      2018   $2,113,871.00;

      2019   $2,390,002.00;

      2020   $1,564,268.00 (from internal financial reports, during the height of the pandemic).

Thus, in the last several years there has been a drop of over 50% of annual revenue. This has been caused by increased competition from for-profit exercise and gym facilities, together with the sale of the downtown and north Topeka Y locations, and a camp owned by the Topeka Y to third parties. The Topeka Y held three locations in 2016 and 2017, hence the approximate $4,000,000.00 revenue.

There are approximately nineteen (19) for-profit gym and fitness facilities in Topeka, Kansas, including:

        a.      Colaw Fitness;

        b.      Pinnacle Fitness;

9

c.   Two Genesis Health Clubs locations;

d.   Sunflower Strength & Conditioning;

e.   Anytime Fitness;

f.   Lionheart Athletic Performance and Fitness;

g.   Planet Fitness;

h.   CrossFit Free State;

i.   GreatLIFE Central;

j.   Total Fitness Body Zone;

k.   Fitrition - Topeka;

l.   Strength Guild Topeka

m.   Crunch Fitness;

n.   Baila Fitness Studio Topeka;

o.   Sonny's Gym;

p.   Jazzercise Topeka East Fitness Center;

q.   Jazzercise Topeka North Fitness Center;

r.   Jazzercise Topeka West Fitness Center; and

s.   Fitness In Training.

These for-profit facilities have targeted their marketing for younger, more affluent parties, leaving to the Topeka Y its traditional member or customer base, the young and the elderly.

**22.3   Appraisal of Facility**

The Debtor and CoreFirst's counsel each obtained appraisals of the Southwest Topeka Facility. CoreFirst's appraisal was prepared by Keller, Craig & Associates of Overland Park, Kansas. The Debtor's was prepared by Valbridge Property Advisors of Overland Park, Kansas. For the purpose of this Plan, the Debtor accepts CoreFirst's valuation of $2,010,000.00 of the Debtor's real property and treats the bondholders claims as secured claims in that amount.

**22.4   Current Rate Structure**

10

The Topeka Y contains a basketball court, an indoor pool, daycare services, an indoor track, workout facilities and aerobic facilities and provides youth sports teams and youth summer and after school camps. Fees range from $18.00 to $58.00 per month. For adults the monthly fee is $38.00 and $34.00 for those sixty (60) and over. Family rates begin at $58.00 per month, which covers two parents and all dependents under the age of twenty (20).

As a not-for-profit organization, the Topeka Y has historically offered financial assistance to members who qualify, which could drop the monthly fees down to $5.00 or less per month for a full membership.

## 22.5 Actions and Activities Subsequent to the Filing of the Bankruptcy

This bankruptcy case was filed on May 21, 2020. Complete bankruptcy schedules were filed at that time. The Debtor has undertaken certain activities at the outset of the case, including:

      a.     The engagement of Hinkle Law Firm LLC ("Hinkle") as its counsel;

      b.     The Motion to assume the National YMCA executory contract consisting of the Constitute of the National Counsel of The Young Men's Christian Associations of the United States of America, the Bylaws of the National Counsel of The Young Men's Christian Association, together with the legislative history and bylaws, thus providing a license to use certain trademarks, names, and a designation as a rostered association of the YMCA of the United States;

      c.     The Motion to maintain current cash management systems;

      d.     The Motion to pay the "stub" period pre-petition wages of employees;

      e.     The Motion to offer adequate assurances and security deposits to utility companies;

      f.     The Motion for adequate protection to the Bond Trustee under 11 U.S.C. §361 and 11 U.S.C. §363(e). This adequate protection Motion asserted that the Series 2011A Bonds were a disguised financing transaction, and thus adequate protection needed to be offered to the bondholders. An adequate protection payment of $9,646.00 per month was proposed to be paid. This was approved by the Bankruptcy Court and the Debtor commenced such payments in June, 2020. The $9,646.00 monthly sum constituted an approximate amortization of the valuation of $1,635,000.00, over a 25-year duration at 5.00% per year;

      g.     The Motion for payment of critical vendors;

      h.     The Motion to establish a bar date of submission of claims. The bar date for creditors has been established as of July 31, 2020, prior to the expiration of the ninety (90)-day period for the submission of the Debtor's Plan under 11 U.S.C. §1189(b). Unsecured claims, both filed and scheduled, are summarized on Exhibit A-3, attached;

i.     The Debtor's initial Chapter 11 Plan [Dkt #101] and corresponding objection of CoreFirst Bank as Bond Trustee [Dkt #131];

j.     Debtor's Motion under Rule 3017(e) and Rule 3017.2 to Determine Adequacy of Procedures for Plan Voting [Dkt #118] and the objection thereto by CoreFirst Bank [Dkt #133] and the United States Trustee [Dkt #140];

k.     The Debtor's Amended Plan filed November 11, 2020 [Dkt # 162];

l.     John Mugler, the Debtor's CEO resigned effective February 28, 2021 and the Debtor's Board of Directors approved the employment of Glenn Haley as Interim CEO effective March 1, 2021. Haley was assigned by YUSA as a specialist in turning around financially distressed YMCA's;

m.     In late May and early June, 2021, the Topeka Y Foundation, a not-for-profit foundation, raised over $270,000.00 to be made available to assist the Debtor with current operational shortfalls and for capital improvements to the Debtor's building if the Plan is confirmed in this case; and

n.     Application to employ accountants: On May 27, 2020, the Debtor filed an application to employ Sink, Gordon & Associates, LLP to prepare monthly reporting, cash flow analysis, tax returns, and general accounting. An order was entered approving their employment on June 22, 2020. On June 21, 2021, the Debtor filed an application to employ Shipley CPA, LLC to assist in monthly reporting, cash flow and general financial analysis. Russell Shipley was employed by Sink, Gordon & Associates, but left to form his own company. Shipley is familiar with the Debtor's operations. That application is pending as of the filing of the Plan.

## ARTICLE 23
## CASH AND BANK RESERVES

The Debtor holds monies in specially earmarked accounts. On the Debtor's balance sheet there are certain restricted accounts to which the Debtor is entitled to annual distributions. While the total amount of the restricted funds is identified, the Debtor has limited ability to receive funds. Independent trustees or fiduciaries exist that transfer annual contributions to the Debtor in accordance with the donor's wishes. Because of uncertainty as to the amount of the contributions, they are not shown on the projected cash flow of the Debtor, and they are also not included in the Liquidation Analysis.

The Debtor further maintains accounts of which it does have control. These accounts include the following:

| Account | Amount on Schedules | Balance on June 18, 2021 |
|---|---|---|
| Capitol Federal Programs Account | $ 6,262.12 | $ 0.00 |

12

| | | |
|---|---|---|
| Capitol Federal Operating Account | $ 67,540.82 | $ 6,664.67 |
| Capitol Federal Deferred Maintenance Account #***4127 | $178,339.70 | $ 350.86 |
| Capitol Federal COVID-19 PPP Loan Account | $159,193.61 | $ 0.00 |
| Capitol Federal Keuhne Branch Account | $ 0.00 | $ 0.00 |
| Capitol Federal Southwest Branch Account | $ 0.00 | $ 0.00 |
| Capitol Federal Camp Hammond CD #***5806 | $ 0.00 | $ 0.00 |
| Capitol Federal Camp Hammond CD #***4557 | $ 25,261.71 | $ 25,792.54 |
| Capitol Federal Camp Hammond CD#***8306 | $101,820.40 | $ 104,311.69 |
| Capitol Federal DT&N CD#***8446 | $ 0.00 | $ 0.00 |
| Capitol Federal DT&N CD#***8133 | $ 50,795.95 | $ 51,888.28 |
| Capitol Federal DT&N CD#***9071 | $ 0.00 | $ 0.00 |
| Capitol Federal DT&N CD#***7820 | $ 50,759.95 | $ 51,888.28 |
| Oppenheimer & Co., Inc. Mutual Funds ***3240 | $ 89,411.23 | $ 83,346.24 |
| **Total** | $729,385.49 | $ 324,242.56 |

The Debtor has used the COVID-19 PPP Loan account for operating expenses and that loan has been applied for to be forgiven under applicable guidelines.

The Bond Reserve Fund and PI Funds are utilized at the discretion of the Bond Trustee, and are thus not available. Presumably they will either be maintained or distributed at the discretionary standard set forth in the bond documents.

The Oppenheimer Mutual Funds account are unrestricted funds.

Payments will be made consistent with the cash flow attached hereto as **Exhibit B**.

## ARTICLE 24
## ADDITIONAL CAPITAL EXPENDITURES

Management has obtained estimates of $84,735.00 for new HVAC units. There are currently four HVAC units, two of them were scheduled to be replaced in the summer of 2020.

13

Further, management believes that $150,000.00 is necessary in pool repairs and upgrading. The pool heaters and pumps are over twenty (20) years old and much of the fixtures and galvanized plumbing are still original. Management estimates that major motors, pumps and seals will need to be replaced in the near term. The estimate of repair expense through the end of 2020 is $45,000.00.

The lockers for storage in the locker room will additionally need to be replaced. The thought is to replace the outer doors of the existing locker rooms to avoid the cost of total refurbishment. The total locker room repairs are estimated to be $43,000.00, including new shower hardware.

Fitness equipment is also outdated, much of which is the original equipment. Management believes it is critical to replace the circuit training equipment within the next year. StarTrack has made a bid for $14,000.00. This equipment would be consistent with the existing equipment, plus we have trusted service personnel for repairs. The cost is in line with national YUSA pricing. The current benchmark is to replace treadmills at a rate of four a year with an estimated cost of $19,000.00.

Outstanding estimates of current capital expenditure work needs are attached hereto as **Exhibit C**. Management believes that if this Plan is confirmed, funds can be raised to make significant repairs and improvements to the facility.

## ARTICLE 25
## LIQUIDATION ANALYSIS

The Debtor believes it can raise funds for capital expenditures after this Plan is confirmed and the Debtor has allocated $7,000 per month in its budget for capital expenditures. Moreover, community volunteers are assisting when appropriate with repairs.

Thus, the total dollars allocated to the Liquidation Analysis will be from the following sums:

| Asset | Balance on Schedules | Balance as of 06.18.21 |
|---|---|---|
| Cash on hand | $     300.00 | $     367.00 |
| Capitol Federal Operating Acct | $  67,540.82 | $    6,664.67 |
| Capitol Federal Deferred Maintenance Account #***4127 | $178,339.70 | $     350.86 |
| Capitol Federal DT&N CD#***8133 | $  50,795.95 | $  51,888.28 |
| Capitol Federal DT&N CD#***7820 | $  50,759.95 | $  51,888.28 |
| Oppenheimer & Co., Inc. Mutual Funds ***3240 | $  89,411.23 | $  83,346.24 |

14

| | | |
|---|---|---|
| Accounts Receivable | $ 50,546.94 | $ 27,238.44 |
| 1998 Ford E-350 short limo bus | $ 3,500.00 | $ 3,000.00 |
| 1998 Bluebird flat nose school bus | $ 5,500.00 | $ 4,800.00 |
| 2017 Doolittle trailer | $ 3,000.00 | $ 3,000.00 |
| 2015 Buckdandy double axle flat trailer w/ramp | $ 2,000.00 | $ 2,000.00 |
| Exercise equipment and accessories | $111,950.00 | $ 44,406.00 |
| Mower, yard equipment, appliances, televisions and projectors | $ 18,650.00 | $ 18,650.00 |
| **Total:** | $632,294.59 | $ 297,599.77 |

It is presumed a Chapter 7 trustee would earn a trustee's fees under 11 U.S.C. §326 of $18,130.00; that a Chapter 7 trustee would incur attorney's fees of $5,000.00 attempting to collect accounts receivable and selling assets; and that an auctioneer would charge a ten percent commission selling the physical assets for a total commission of $7,585.00. Thus, the total costs in a Chapter 7 liquidation would be $30,175.00, yielding a liquidation amount of $266,885.00.

It is anticipated that the de minimis creditors with claims of less than $2,500.00 will be paid in full on the Effective Date by the Debtor. Thus, the only distributions to be made under the Plan to unsecured creditors will be to the Bond Trustee on behalf of the Bondholders and any Article 11, Class B creditors who do not elect to be treated as Article 11, Class A creditors. These distributions will be of two components: 1) the secured claim of the bondholders in the sum of $2,010,000.00; and 2) a minimum distribution of $266,885.00 over five (5) years as the minimum required under the Liquidation Analysis. No interest will be paid on the unsecured portion of the claim.

## ARTICLE 26
## MANAGEMENT

The new Interim CEO of the Debtor is Glenn Haley. Mr. Haley was hired effective March 1, 2021. Mr. Hayley's compensation is $100,000.00 annually. The unpaid Board of Directors consists of thirteen (13) members, including emeritus members, of the Topeka community. There is an Executive Committee of seven (7) members.

Additionally, there are approximately twelve (12) full-time employees, three (3) for the Southwest Topeka Facility and nine (9) at the childcare locations. There are seventy (70) part-time employees, fifty (50) at the Southwest Topeka Facility, including janitorial, lifeguards, and fitness class instructors, and twenty (20) at the childcare locations, including prime time, daycare, summer camp and Kids Club.

15

## ARTICLE 27
## CURRENT MEMBERSHIP

The Topeka Y defines membership in "Units" which define a paying member.  In January, 2017, the Southwest Topeka Facility had 2,730 Units.  Immediately after a new gym opened in the area (3.1 miles away) 200 Units were lost.

In January, 2020, the Southwest Topeka Facility had 2,536 Units.  Planet Fitness opened its first site in Topeka (2.7 miles away) and it is estimated that 52 Units have been lost.  In early March, 2020, Crush opened a facility at the corner of 29th and Topeka Blvd. In late March, 2020, the national pandemic caused the Debtor's facility to close for the rest of March, April and May, and the Debtor re-opened in June. The closure has impacted membership.  As of May, 2021, the Debtor had 1,702 Units.

The current active membership is 1,755 Units (4,263 individuals). The Topeka Y is optimistic it can maintain 1,775 Units for the remainder of the year. The Topeka Y attracts members and participants from across the city, many of whom are often subsidized. This affords the Topeka Y to seek community support to make up the subsidies provided. This is accomplished through fundraising, grants and foundation support, as well as government support. The Topeka Y is located within a 3 to 5 minute drive of 9,689 households with the median income of $57,534 where the Topeka Y can have a deeper market penetration is by offering programs, services, and facilities that would meet the market demographic needs and expectations. The Topeka Y, upon emerging from bankruptcy, is prepared to raise the appropriate funds to invest in the facility.

The Topeka Y has, with limited capital investment and some marketing, increased members slightly and has grown program participation, which has improved its financial situation. With the new management's continued focus on new positions the Topeka Y can penetrate in the broader community as an affordable, family-friendly, and improved facility where people can have their wellness, social, and mental health needs met, the Topeka Y will regain a membership of 2,400-2,500 units over a three to four year period.

## ARTICLE 28
## ATTRIBUTES AND TAX CONSEQUENCES

The discussions set forth above are for general information only. The Topeka Y, its counsel and accountants are not making any representations concerning the particular tax consequences of this restructure with respect to the Topeka Y or the bondholders, nor are they rendering any form of legal opinion or tax advice on any such tax consequences.  Applicable tax law for non-for-profit corporations is complex and the information provided herein is not contended to be exhaustive. The bondholders are urged to consult independent tax advisors regarding the tax consequences of a restructure.

## ARTICLE 29
## LITIGATION

The Topeka Y was not involved in any litigation prior to this Plan.  Its Foundation has been named in a recent Shawnee County District Court case involving a personal injury accident.  The

16

matter has been referred to the insurance carrier for coverage and legal defense. Because it was a separate entity, the Foundation, the bankruptcy stay or injunction under 11 U.S.C. §362 was not impacted.

## ARTICLE 30
## ALTERNATIVES

The Topeka Y sought to avoid filing a Chapter 11 proceeding to implement its proposed restructure of the bond indebtedness. The Topeka Y wished to avoid that consequence due to the expense involved for the bondholders, Bond Trustee and the Topeka Y. Potential attorneys' fees for the Topeka Y may be up to $100,000.00 if prolonged bankruptcy litigation would continue. The Topeka Y was concerned about declining revenue that might exist if it were in a prolonged Chapter 11 proceeding due to negative publicity. Because of the requirement of one hundred percent (100%) bondholder acceptance of a restructure of the Series 2011A Bonds, this bankruptcy was inevitable.

In addition, the collateral or assets available for the bondholders have limited adaptive reuse. The building is in need of significant roof refurbishment (in excess of normal and customary roof repairs). In addition, capital expenditures will be necessary to implement new or more modern equipment.

The Southwest Topeka Facility is approximately twenty (20) years old and there has been, in recent years, deferred maintenance that has occurred because of declining revenue and the lack of available disposable revenue for improvements.

When the Southwest Topeka Facility was constructed, the location of it was thought to be in a growing residential community. It was anticipated that the city would expand with new subdivisions to the south of the Topeka Y. Regrettably, that has not occurred. However, as the Topeka Y closed the Downtown and the North Y facilities, several of those individuals who wanted a Y experience transferred their membership to the Southwest Y facility. Therefore, the current geographical footprint of the Southwest Y extends to cover the entirety of the city of Topeka and surrounding counties. The current membership program draw is from ten Zip Codes (66614, 66604, 66611, 66605, 66609, 66610, 66603, 66607, 66612, and 66616) and six counties (Shawnee, Jackson, Osage, Jefferson, Douglas, and Wabaunsee). Within a ten minute drive time of the current Y location are 76,528 people and 33,528 households, with a median income of $55,836. This core demographic has been an untapped opportunity for the Topeka Y.

Currently, the Southwest Topeka Y is drawing families from as far away as Lawrence because of a parent working in Topeka. Again, this is a potential marketing opportunity to attract working parents/families in Topeka, as well as those living elsewhere but working in Topeka, to the Y for childcare, day camps, and sports camps. Families are finding their way to the Y. Future marketing opportunities include expanding swimming instruction beginning July 2021. The Y's initial survey received more than 275 requests for swimming lessons.

The Topeka Y has re-engaged with the community and its Y members and because of this re-engagement, the community and members have responded by raising over $270,000 over three weeks. Under new management, the Topeka Y is heading in a positive direction, both financially

17

and spiritually.

## ARTICLE 31
## GENERAL PROVISIONS

### 31.1    **Headings for Convenience Only**

The headings in the Plan are for convenience of reference only and will not limit or otherwise affect the meanings thereof.

### 31.2    **Notices**

Any notice required or permitted to be provided under the Plan will be in writing and served by either: (i) certified mail, return receipt requested, postage prepaid; (ii) hand delivery; or (iii) reputable overnight delivery service, freight prepaid, with copies to the following parties and as may otherwise be set forth in the Plan:

The Debtor:

> W. Thomas Gilman
> Hinkle Law Firm LLC
> 1617 North Waterfront Parkway, Suite 400
> Wichita, KS 67206-6639
> Telephone: 316.267.2000
> Facsimile: 316.264.1518
> Email: tgilman@hinklaw.com
>     *Counsel for the Debtor*

The Trustee:

> Rob Messerli
> 6917 Tomahawk Road
> Prairie Village, KS 66208-2618
> Telephone: 913.662.3524
> Email: rob.messerli@gunrockvp.com

The Bond Trustee:

> R. Patrick Riordan
> Riordan Fincher & Beckerman, P.A.
> 3735 SW Wanamaker Road, Suite A
> Topeka, KS 66610-1396
> Telephone: 785.783.8323
> Facsimile: 785.783.8327
> Email: riordan@frb-lawfirm.com
>     *Counsel for Indenture Bond Trustee*

18

**31.3     Governing Law**

Except to the extent that the Bankruptcy Code is applicable, supersedes or pre-empts state law, the rights and obligations arising under this Plan and any documents, agreements and instruments executed in connection with this Plan (except to the extent such documents, agreement and instruments designate otherwise) shall be governed by and construed and enforced in accordance with the law of the State of Kansas.

**31.4     Environmental Claims**

The Debtor is not aware of any liabilities, claims or obligations due and owing to the Environmental Protection Agency or to the Kansas Department of Health and Environment. Unless any such claim by any of the above and foregoing agencies or governmental organizations have been filed on or before the bar date and/or administrative bar date, whichever is applicable, and subsequently allowed, such entities shall be forever barred from participation in the distribution of any dividends in this proceeding.

**31.5     Tax Claims**

Neither the Debtor, nor its professionals, have undertaken any analysis of the tax results on these Plan provisions and the impact upon the Debtor or creditor.

**31.6     Certified Audit**

The information contained in this Plan and the attached exhibits have not been subject to a certified audit, except as may be subsequently disclosed in any exhibit. Due to the complexity of Debtor's financial matters, the Debtor is unable to warrant that the information contained herein is without inaccuracy, although an effort has been made to be as accurate as possible. The statements contained herein are made as of the date presented, unless another date is specifically referenced and delivery of this Plan does not imply that there have been no changes in information set forth herein since the date hereof.

**31.7     Representation of Debtor**

Hinkle commenced representation of the Topeka Y in mid-2019 to assist in its restructure efforts. Hinkle relied upon information provided to it by the Debtor in connection with the preparation of this Plan. Hinkle had no involvement with the Debtor, or its members, prior to the engagement concerning the restructure and bankruptcy.

**31.8     Forward Looking Statements and Projections**

Any forward-looking statements contained herein are based largely on the expectation of the management of the Debtor and projections about future events affecting the financial condition of the Debtor. Any use of the words "belief," "may," "will," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in

19

this Plan may not occur and actual results could differ materially from those forecasted or anticipated in the forward-looking statements. Neither the Debtor, nor its counsel will undertake any obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

## ARTICLE 32
## LAPSED DISTRIBUTIONS

Any distribution that has not cleared within ninety (90) days of the date of the distribution will lapse. With respect to any lapsed distributions, the lapsed distribution will revert to the Debtor or the Trustee, as the case may be, and be distributed pro rata to the remaining unsecured creditors in accordance with the Plan.

## ARTICLE 33
## UNDELIVERABLE AND UNCLAIMED DISTRIBUTIONS

If any distribution is returned as undeliverable, no further distributions to such creditor will be made unless the Debtor and the Trustee are notified in writing of the creditor's current address. Upon receipt of the notification, the Debtor will remit all missed distributions to the creditor without interest. All claims for undeliverable distributions must be made on or before the first anniversary of the date of the first distribution check to such creditor. If a claim is not made within that time, all unclaimed distributions will revert to the Debtor and be distributed pro rata to the remaining creditors. Nothing in the Plan will require the Debtor and Trustee to attempt to locate any holder of an allowed claim.

## ARTICLE 34
## RETENTION OF JURISDICTION

### 34.1   Purposes

Notwithstanding entry of the confirmation order, the Court shall retain jurisdiction over the Chapter 11 case for the following purposes including, but not limited to the following:

      a.     To determine any and all objections to the allowance of claims or interests, both before and after the confirmation date, including any objections to the classification of any claim. The failure by the Debtor or Trustee to object to any claim prior to confirmation of this Plan shall not be deemed to be a waiver of the Debtor's or Trustee's right to object to or examine the claim and holder post-confirmation under the deadlines set forth herein;

      b.     To determine any and all fee applications and other applications for other fees and expenses authorized to be paid or reimbursed in accordance with the Bankruptcy Code or the Plan;

      c.     To determine any and all pending applications for the assumption or rejection of executory contracts or for the rejection or assumption and assignment, as the case may be, of unexpired leases to which the Debtor is a party or with respect to which it

20

may be liable;

d.      To hear and determine any actions to void or terminate unexpired contracts or leases; and to hear and determine and, if need be, to liquidate any and all claims arising therefrom;

e.      To hear and determine any and all actions initiated by the Debtor or its counsel whether by motion, complaint or otherwise; to determine any and all questions or disputes regarding title to the assets of the estate, and to determine all causes of action, controversies, disputes or conflict, whether or not subject to any action pending as to the confirmation date, between the Debtor and any other party, including, without limitation, any right of the Debtor to recover assets or sell assets pursuant to the provisions of Title 11 of the Bankruptcy Code;

f.      To determine any and all applications, motions, adversary proceedings and contested or litigated matters whether pending before the Court on the confirmation date or instituted after the confirmation date, including, without limitation, proceedings to recover voidable or avoidable transfers, or proceedings by the Debtor;

g.      To modify this Plan or any document created in connection with this Plan, or remedy any defect or omission or reconcile any inconsistence in any order of the Court, this Plan or any document created in connection with this Plan, in such manner as may be necessary to carry out the purposes and effects of this Plan to the extent authorized by the Bankruptcy Code, including any post-confirmation modification to the Plan;

h.      To ensure that the distribution is accomplished in accordance with the provisions of this Plan;

i.      To allow, disallow, determine, liquidate or estimate any claim or interest and to enter or enforce any order requiring the filing of any such claim or interest before a particular date;

j.      To enter such orders as may be necessary to consummate, implement and effectuate the operative provisions of this Plan and all documents and agreements provided for herein or therein or executed pursuant hereto or thereto including, without limitation, entering appropriate orders to protect the Debtor from creditor action;

k.      To hear any other matter not inconsistent with Chapter 11 of the Bankruptcy Code;

l.      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked or vacated;

m.      To determine such other matters as may arise in connection with this Plan or the Confirmation Order;

n.      To enter an Order enforcing the injunction entered by this Court at

21

confirmation of this Plan, to enter any Order separately or in conjunction with any other of confirmation of this Plan discharging the Debtor from any claim or debt and enjoining any action from proceeding or being pursued against the Debtor, except as required by the Debtor under the terms of this Plan; and

        o.     To enter a Final Decree closing this Chapter 11 case.

## 34.2   Exclusive Jurisdiction

The Court shall have exclusive jurisdiction to resolve all controversies, suits and disputes that may arise in connection with the interpretation, enforcement, consummations, implementation or administration of this Plan and all entities shall be enjoined from commencing any legal or equitable action or proceeding with respect to such matters in any other court administrative or regulatory body.

## 34.3   Abstention

If the Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of this Chapter 11 case, this provision shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**ARTICLE 35**
**FORM OF BALLOT**

The form of the ballot to be submitted and distributed to creditors and parties will be agreed upon by counsel for the Debtor and counsel for CoreFirst, or in the absence of an agreement, by order of the Court.

THE YOUNG MEN'S CHRISTIAN
ASSOCIATION OF TOPEKA, KANSAS

*Glenn Haley*

Glenn Haley, Interim Chief Executive Officer

RESPECTFULLY SUBMITTED:

HINKLE LAW FIRM LLC


 /s/W. Thomas Gilman
W. Thomas Gilman, #11867
1617 North Waterfront Parkway, Suite 400
Wichita, KS  67206-6639
316.267.2000 / 316.264.1518 fax
tgilman@hinklaw.com
        *Attorney for Debtor*

# EXHIBIT A(1)
## PRIORITY CLAIMS

The priority claims consist of all priority claims of any pre-petition priority creditor who may file an allowed claim prior to the date of confirmation. The Debtor did not schedule any priority claims and no priority claims have been filed.

To the extent post-petition administrative claims have or shall be unpaid in full, they include the claim of the Hinkle Law Firm for unpaid attorneys' fees. Hinkle Law Firm received a pre-petition retainer of $50,000.00. Immediately prior to the filing of the bankruptcy, Hinkle Law Firm paid in full its current pre-petition unpaid attorneys' fees, leaving a balance disclosed in the bankruptcy schedules of $38,860.00 for post-petition services. Those funds have been exhausted and as of June 18, 2021, the net sum due the firm after crediting $12,114.00 for the amount of severance paid John Mugler is approximately $5,000.00. The law firm estimates an additional $10,000.00 will be due for preparing, filing and confirming this Plan.

Additional post-petition professional expenses will be incurred by the Debtor's accountant, Shipley, CPA, LLC, for accounting services. This firm has not received a retainer and an estimated $5,000.00 will be due for preparing and filing this plan.

Rob Messerli has been appointed the Subchapter V - Small Business Debtor Trustee. He is to be compensated at an hourly rate as may be allowed by the Court. The ongoing Trustee fees will be paid as an additional administrative expense from available funds as incurred over the life of the Plan.

All other administrative expenses shall be paid upon approval of the Court from available cash resources within sixty (60) days of confirmation, although none are anticipated.

Case 20-20786    Doc# 227    Filed 07/01/21    Page 24 of 34

## EXHIBIT A(2)
## SECURED CREDITORS

The secured creditors consist of the claim of the Series 2011A bondholders represented by CoreFirst Bank as Bond Trustee. CoreFirst Bank holds a lien upon the Debtor's real estate in the amount of $2,010,000.00. Upon issuance of the bonds in the year 2000, equipment was also purchased from bond proceeds. However, that equipment has long since passed its useful life and is no longer operational. Therefore, no value is associated with equipment as secured to CoreFirst Bank. The equipment valuation is contained in the Liquidation Analysis as a supplemental payment to unsecured creditors, of which the Series 2011A bondholders are the largest class. The secured payment to the bondholders is based upon a twenty (20)-year amortization at 5% per annum on a secured valuation of $2,010,000.00. Monthly payments of $13,266.00 shall be made commencing on the Effective Date (estimated as of October 1, 2021).

The remainder of the bondholders' claim shall be treated as an unsecured claim and paid an amount represented on the Liquidation Analysis as the value of the unsecured assets, minus a Chapter 7 trustee's presumed costs, for a net amount of $266,885.00, as more fully set forth in Article 25.

## EXHIBIT A(3)
## UNSECURED CLAIMS

The unsecured claims of the bankruptcy case consists of the following:

**CLAIMS SCHEDULED**

1.      Capital Federal Savings Bank. This is to be forgiven per SBA Rules;

2.      City of Topeka, Shawnee County Metropolitan Planning Department, 515 South Kansas Avenue, Suite 404, Topeka, Kansas 66603 Attn: Chief Administrative Officer for any liquidated amounts under the indemnity provisions of the Bond Purchase Agreement (contingent / disputed), no claim filed prior to bar date;

3.      George K. Baum & Company, 4801 Main Street, Suite 500, Kansas City, Missouri 64112, Attn: Roger Edgar, Executive Vice President for any liquidated claim under the indemnity provisions of the Bond Purchase Agreement (contingent/ disputed), no claim filed prior to bar date;

4.      CoreFirst Bank & Trust, 3035 SW Topeka Blvd., Topeka, Kansas 66611, Attn: Corporate Trust Department for any liability of the Debtor to CoreFirst Bank for breach of the Debtor's duties to CoreFirst Bank for CoreFirst Bank serving as dissemination agent under the Continuing Disclosure Agreement (contingent / disputed), claim filed (see below).

5.      Continental Research Corp for chemicals and disinfectant products in the sum of $235.61 (Article 11 – Class A);

6.      Inland Waste Solutions on an open account in the sum of $294.29 (Article 11 – Class A);

7.      Sunflower Rental in the sum of $560.00 (Article 11 – Class A);

8.      West Bend Mutual Insurance Co. in the sum of $3,249.18 (Article 11 – Class B).

**CLAIMS FILED**

Claim No. 1 Evergy Kansas Central: $2,896.04 (Article 11 – Class B)

Claim No. 2 Constellation NewEnergy: $369.20 (Article 11 – Class A)

Claim No. 3 CoreFirst: Bondholders' undersecured claim (Article 11 – Class B)

Claim No. 4 IRS unsecured, nonpriority $271.79 (Article 11 – Class A)

The claims of unsecured creditors will be allocated in two tranches:

**De minimis Unsecured Creditors (Article 11 – Class A)**.  De minimis or minor unsecured creditors are creditors who have a claim of $2,500.00 or less.  It is the Debtor's intention to satisfy

in full the claims of the de minimis creditors. The Debtor estimates that a total sum of approximately $10,000 will be utilized for the satisfaction of the de minimis unsecured creditors.

**Remaining Unsecured Creditors (Article 11 – Class B)**. Unsecured and undersecured claims in excess of $2,500.00. Creditors in this class may elect to be treated as Article 11 – Class A creditors and accept $2,500.00 in full satisfaction of their claims. For example, rather than receiving payment on $2,896.04 over three years, Evergy may elect to receive $2,500.00 on the Effective Date and waive the balance of its claim.

Distributions will be made to the Subchapter V Trustee for all third party creditors and to CoreFirst Bank as Indenture Bond Trustee on behalf of the bondholders.

**EXHIBIT B**
**CASH FLOW**

# EXHIBIT B - CASH FLOW

| | May 31, 2021 | Projected June 30, 2021 | July 31, 2021 | August 31, 2021 | September 30, 2021 | October 31, 2021 | November 30, 2021 | December 31, 2021 |
|---|---|---|---|---|---|---|---|---|
| **Beginning Cash Available for Operations** | $ 54,906 | $ 17,213 | $ 57,717 | $ 57,969 | $ 72,335 | $ 38,752 | $ 154,134 | $ 119,517 |
| **Receipts** | | | | | | | | |
| Membership | 54,086 | 54,000 | 54,000 | 54,000 | 55,906 | 55,906 | 55,906 | 55,906 |
| Camps and Classes | 2,324 | 30,000 | 35,000 | 5,000 | 1,500 | 1,500 | 1,500 | 1,500 |
| Daycare | 33,438 | 19,767 | 15,000 | 42,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| Contribution | 8,011 | 50,000 | 50,000 | 55,000 | 10,000 | 10,000 | 25,000 | 25,000 |
| Building rental | 746 | 150 | 150 | 150 | 800 | 800 | 800 | 800 |
| Other miscellaneous income | 245 | 1,610 | 1,610 | 1,610 | 1,610 | 1,610 | 1,610 | 1,610 |
| Cash inflation from other source | - | - | - | - | - | 175,000 | - | - |
| **Total Receipts** | 98,850 | 155,527 | 155,760 | 157,760 | 109,811 | 284,811 | 124,811 | 124,811 |
| **Expenses** | | | | | | | | |
| Payroll and related expenses | 71,045 | 54,684 | 90,862 | 78,748 | 78,747 | 78,748 | 78,747 | 78,748 |
| Operating expenses* | 83,908 | 76,047 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 |
| Capital expenditures | 5,544 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| Other miscellaneous expenses | (33,608) | (32,354) | - | - | - | - | - | - |
| Bondholders adequate protection payment | 9,655 | 9,646 | 9,646 | 9,646 | 9,646 | - | - | - |
| **Plan payments** | | | | | | | | |
| Priority claims | - | - | - | - | - | - | - | - |
| Secured Claim of Bondholder | - | - | - | - | - | 5,000 | 5,000 | 5,000 |
| Unsecured claims, Article 11 Class A | - | - | - | - | - | 13,266 | 13,266 | 13,266 |
| Unsecured claims, Article 11 Class B | - | - | - | - | - | 10,000 | - | - |
| Unsecured claims, Article 11 Class B | - | - | - | - | - | 7,410 | 7,410 | 7,410 |
| **Total Expenses** | 136,544 | 115,022 | 155,508 | 143,394 | 143,394 | 169,422 | 159,422 | 159,422 |
| **Ending Cash Available for Operations** | $ 17,213 | $ 57,717 | $ 57,969 | $ 72,335 | $ 38,752 | $ 154,134 | $ 119,517 | $ 84,899 |
| **Cash used for operations:** | | | | | | | | |
| Petty cash | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 |
| Operating account | 16,498 | 57,235 | 57,603 | 71,965 | 38,386 | 153,766 | 119,151 | 84,533 |
| Deferred maintenance accoun | 164 | - | - | - | - | - | - | - |
| Deferred maintenance sweep accoun | 187 | - | - | - | - | - | - | - |
| YMCA Programs accoun | - | - | - | - | - | - | - | - |
| | $ 17,213 | $ 57,717 | $ 57,969 | $ 72,335 | $ 38,752 | $ 154,134 | $ 119,517 | $ 84,899 |
| **Other sources of cash balances:** | | | | | | | | |
| Bond Reserve | 375,141 | 375,141 | 375,141 | 375,141 | 375,141 | 375,141 | 375,141 | 375,141 |
| CDs | 233,362 | 233,336 | 233,336 | 233,336 | 233,336 | 233,336 | 233,362 | 233,362 |
| Y Foundation fundraise | 290,000 | 220,000 | 170,000 | 115,000 | 115,000 | - | - | - |
| Oppenheimer Acct | 89,411 | 89,411 | 89,411 | 89,411 | 89,411 | 89,411 | 89,411 | 89,411 |
| | $ 89,411 | $ 89,411 | $ 89,411 | $ 89,411 | $ 89,411 | $ 29,411 | $ 29,411 | $ 29,411 |
| ROUNDING | -1 | - | - | - | - | - | - | - |

| | January 31, 2022 | February 28, 2022 | March 31, 2022 | April 30, 2022 | May 31, 2022 | June 30, 2022 | July 31, 2022 | August 31, 2022 | September 30, 2022 | October 31, 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| $ | 84,89x | 55,43x | 38,97x | 36,07x | 38,17x | 39,77x | 44,25x | 73,73x | 67,33x | 63,93x |
| | 80,00x | 82,00x | 82,00x | 82,00x | 82,00x | 79,00x | 79,00x | 79,00x | 82,00x | 82,00x |
| | 3,00x | 3,00x | 5,00x | 10,00x | 10,00x | 50,00x | 75,00x | 5,00x | 5,00x | 5,00x |
| | 42,00x | 42,00x | 42,00x | 42,00x | 42,00x | 20,00x | 20,00x | 42,00x | 42,00x | 42,00x |
| | 17,00x | 16,00x | 16,00x | 16,00x | 16,00x | 16,00x | 16,00x | 16,00x | 16,00x | 16,00x |
| | 16,00x | 16,00x | 16,00x | 16,00x | 16,00x | | | | | |
| | 1,00x | 1,00x | 1,50x | 1,50x | 1,00x | 1,00x | 1,00x | 1,00x | 1,00x | 1,00x |
| | 10,02x | 10,02x | 10,02x | 10,02x | 10,02x | 10,02x | 10,02x | 10,02x | 10,02x | 10,02x |
| | - | | | | | | | | | |
| | 153,02x | 159,02x | 156,52x | 161,52x | 161,02x | 176,02x | 201,02x | 153,02x | 156,02x | 156,02x |
| | 84,805 | 84,805 | 78,748 | 78,747 | 78,748 | 90,862 | 90,863 | 78,747 | 78,748 | 78,747 |
| | 65,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 |
| | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| | - | - | - | - | - | - | - | - | - | - |
| | - | | | | | | | | | |
| | - | | | | | | | | | |
| | 5,000 | 5,000 | | | | | | | | |
| | 13,26x | 13,26x | 13,26x | 13,26x | 13,26x | 13,26x | 13,26x | 13,26x | 13,26x | 13,26x |
| | - | - | - | - | - | - | - | - | - | - |
| | 7,41x | 7,41x | 7,41x | 7,41x | 7,41x | 7,41x | 7,41x | 7,41x | 7,41x | 7,41x |
| | 182,48x | 170,48x | 159,42x | 159,42x | 159,42x | 171,54x | 171,54x | 159,42x | 159,42x | 159,42x |
| $ | 55,439 | 38,979 | 36,076 | 38,174 | 39,771 | 44,254 | 73,736 | 67,334 | 63,931 | 60,529 |
| $ | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 |
| | 55,07x | 38,61x | 35,71x | 37,80x | 39,40x | 43,88x | 73,37x | 66,96x | 63,56x | 60,16x |
| | - | - | - | - | - | - | - | - | - | - |
| | - | | | | | | | | | |
| $ | 55,43x | 38,97x | 36,07x | 38,17x | 39,77x | 44,25x | 73,73x | 67,33x | 63,93x | 60,52x |
| $ | 375,14x | 375,14x | 375,14x | 375,14x | 375,14x | 375,14x | 375,14x | 375,14x | 375,14x | 375,14x |
| $ | 233,36x | 233,36x | 233,36x | 233,36x | 233,36x | 233,36x | 233,36x | 233,36x | 233,36x | 233,36x |
| $ | 29,41x | 29,41x | 29,41x | 29,41x | 29,41x | 29,41x | 29,41x | 29,41x | 29,41x | 29,41x |

| | November 30, 2022 | December 31, 2022 | January 31, 2023 | February 28, 2023 | March 31, 2023 | April 30, 2023 | May 31, 2023 | June 30, 2023 | July 31, 2023 | August 31, 2023 |
|---|---|---|---|---|---|---|---|---|---|---|
| $ | 60,525 | 52,626 | 44,724 | 38,764 | 34,804 | 39,401 | 48,999 | 58,096 | 71,579 | 85,061 |
| | 82,000 | 82,000 | 93,500 | 89,500 | 89,500 | 89,500 | 89,500 | 88,000 | 88,000 | 88,000 |
| | 500 | 500 | 3,000 | 3,000 | 5,000 | 10,000 | 10,000 | 50,000 | 50,000 | 15,000 |
| | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | 20,000 | 20,000 | 45,000 |
| | 16,000 | 16,000 | 17,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| | 1,000 | 1,000 | 1,000 | 1,000 | 1,500 | 1,500 | 1,000 | 1,000 | 1,000 | 1,000 |
| | 10,025 | 10,025 | 10,025 | 10,025 | 10,025 | 10,025 | 10,025 | 10,025 | 10,025 | 10,025 |
| | 151,525 | 151,525 | 166,525 | 161,525 | 164,025 | 169,025 | 168,525 | 185,025 | 185,025 | 175,025 |
| $ | 78,748 | 78,747 | 84,805 | 84,805 | 78,748 | 78,747 | 78,748 | 90,862 | 90,863 | 78,747 |
| | 53,000 | 53,000 | 60,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 |
| | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| | | | | | | | | | | |
| | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 |
| | 7,415 | 7,415 | 7,415 | 7,415 | 7,415 | 7,415 | 7,415 | 7,415 | 7,415 | 7,415 |
| | 159,427 | 159,427 | 172,487 | 165,487 | 159,427 | 159,427 | 159,428 | 171,541 | 171,541 | 159,427 |
| $ | 52,626 | 44,724 | 38,764 | 34,804 | 39,401 | 48,999 | 58,096 | 71,579 | 85,061 | 100,659 |
| $ | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 | 366 |
| | 52,264 | 44,351 | 38,391 | 34,434 | 39,031 | 48,633 | 57,731 | 71,213 | 84,695 | 100,293 |
| | | | | | | | | | | |
| $ | 52,626 | 44,724 | 38,764 | 34,804 | 39,401 | 48,999 | 58,096 | 71,579 | 85,061 | 100,659 |
| $ | 375,145 | 375,145 | 375,145 | 375,145 | 375,145 | 375,145 | 375,145 | 375,145 | 375,145 | 375,145 |
| $ | 233,365 | 233,365 | 233,365 | 233,365 | 233,365 | 233,365 | 233,365 | 233,365 | 233,365 | 233,365 |
| $ | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 |
| $ | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 | 29,411 |

| | September 30, 2023 | October 31, 2023 | November 30, 2023 | December 31, 2023 | January 31, 2024 | February 28, 2024 | March 31, 2024 | April 30, 2024 | May 31, 2024 | June 30, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|
| | $ 100,65? | $ 116,25? | $ 131,85? | $ 147,45? | $ 163,04? | $ 160,08? | $ 159,12? | $ 166,72? | $ 179,32? | $ 191,42? |
| | 88,000 | 88,000 | 88,000 | 88,000 | 93,50? | 89,50? | 89,50? | 89,50? | 89,50? | 88,000 |
| | 15,000 | 15,000 | 15,000 | 15,000 | 3,00? | 3,00? | 5,00? | 10,00? | 10,00? | 50,00? |
| | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 20,000 |
| | 16,000 | 16,000 | 16,000 | 16,000 | 17,00? | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 |
| | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,50? | 1,50? | 1,000 | 1,000 |
| | 10,022 | 10,022 | 10,022 | 10,022 | 10,022 | 10,022 | 10,022 | 10,022 | 10,022 | 10,022 |
| | 175,022 | 175,022 | 175,022 | 175,022 | 169,522 | 164,522 | 167,022 | 172,022 | 171,522 | 185,022 |
| | 78,748 | 78,747 | 78,748 | 78,747 | 84,805 | 84,805 | 78,748 | 78,747 | 78,748 | 90,862 |
| | 53,000 | 53,000 | 53,000 | 53,000 | 60,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 |
| | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 |
| | 7,41? | 7,41? | 7,41? | 7,41? | 7,41? | 7,41? | 7,41? | 7,41? | 7,41? | 7,41? |
| | 159,42? | 159,42? | 159,42? | 159,42? | 172,48? | 165,48? | 159,42? | 159,42? | 159,42? | 171,54? |
| | $ 116,256 | $ 131,854 | $ 147,451 | $ 163,049 | $ 160,089 | $ 159,129 | $ 166,726 | $ 179,324 | $ 191,421 | $ 204,904 |
| | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 |
| | 115,891 | 131,481 | 147,088 | 162,68? | 159,72? | 158,76? | 166,36? | 178,95? | 191,05? | 204,53? |
| | $ 116,25? | $ 131,85? | $ 147,45? | $ 163,04? | $ 160,08? | $ 159,12? | $ 166,72? | $ 179,32? | $ 191,42? | $ 204,90? |
| | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? | $ 375,14? |
| | 233,76? | 233,76? | 233,76? | 233,76? | 233,76? | 233,76? | 233,76? | 233,76? | 233,76? | 233,76? |
| | $ 29,41? | $ 29,41? | $ 29,41? | $ 29,41? | $ 29,41? | $ 29,41? | $ 29,41 | $ 29,41? | $ 29,41? | 29,41? |

**ASSUMPTIONS**

$9,646 bond and interest expense for debt through September 1, 2021, $13,266 after, at 20 years, 5.0% $2,010,000.

Article 11, Class B payments of $266,885.00 over 36 months, monthly payments of $7,414.

*Operating expenses include expenses for Daycare, supplies, utilities, insurance, typical professional fees, fundraising, fees and charges, other gym expenses, repairs and maintenance, and camps and classes.

| | July 31, 2024 | August 31, 2024 | September 30, 2024 | October 31, 2024 | November 30, 2024 | December 31, 2024 |
|---|---|---|---|---|---|---|
| | $ 206,90 | $ 218,38 | $ 233,98 | $ 249,58 | $ 272,59 | $ 295,60 |
| | 88,00 | 80,00 | 80,00 | 80,00 | 80,00 | 80,00 |
| | 50,00 | 15,00 | 15,00 | 15,00 | 15,00 | 15,00 |
| | 20,00 | 45,00 | 45,00 | 45,00 | 45,00 | 45,00 |
| | 16,00 | 16,00 | 16,00 | 16,00 | 16,00 | 16,00 |
| | 1,00 | 1,00 | 1,00 | 1,00 | 1,00 | 1,00 |
| | 10,02 | 10,02 | 10,02 | 10,02 | 10,02 | 10,02 |
| | 185,02 | 175,02 | 175,02 | 175,02 | 175,02 | 175,02 |
| | 90,863 | 78,747 | 78,748 | 78,747 | 78,748 | 78,747 |
| | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 | 53,000 |
| | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
| | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 | 13,264 |
| | 7,414 | 7,414 | 7,414 | | | |
| | 171,54 | 159,42 | 159,42 | 152,01 | 152,01 | 152,01 |
| | $ 218,386 | $ 233,984 | $ 249,581 | $ 272,593 | $ 295,604 | 318,616 |
| | $ 366 | $ 366 | $ 366 | $ 366 | $ 366 | 366 |
| | 218,02 | 233,61 | 249,21 | 272,22 | 295,23 | 318,25 |
| | $ 218,38 | $ 233,98 | $ 249,58 | $ 272,59 | $ 295,60 | 318,61 |
| | $ 375,14 | $ 375,14 | $ 375,14 | $ 375,14 | $ 375,14 | 375,14 |
| | 233,36 | 233,36 | 233,36 | 233,36 | 233,36 | 233,36 |
| | 29,41 | 29,41 | 29,41 | 29,41 | 29,41 | 29,41 |

**EXHIBIT C**
**CAPITAL IMPROVEMENT ESTIMATES**

| | |
|---|---|
| $117,550.00 | Roof replacement |
| $ 71,448.50 | Parking lot refurbishment |
| $ 15,150.00 | E Lobby air handling RTU replacement |
| $ 15,150.00 | W Lobby air handling RTU replacement |
| $ 19,885.00 | Gym air handling RTU replacement |
| $ 23,800.00 | Wellness air handling RTU replacement |
| <u>$ 10,450.00</u> | Office air handling RTU replacement |
| <u>$273,433.50</u> | |